UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
SALEHA SATTAR,

                              Plaintiff,

     -against-

GREEN & COHEN P.C., MICHAEL R. COHEN,
ZARA CONTROL, LLC, ZARA REALTY
HOLDING CORP., AND HILLSIDE PARK
168 LLC,

                         Defendants.
------------------------------------------------------------------x

Civil Action No.


**COMPLAINT AND DEMAND FOR JURY TRIAL**


       Saleha Sattar ("Plaintiff" or "Ms. Sattar"), by her attorneys The Legal Aid Society and

The Law Office of Ahmad Keshavarz, files suit against Defendants Green & Cohen P.C. ("Green

& Cohen") and Michael R. Cohen ("Mr. Cohen") (collectively "Attorney Defendants") for their

violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. sec.* (the "FDCPA"),

Judiciary Law § 487, General Business Law ("GBL") § 349 and committing gross negligence,

and against Zara Control, LLC ("Zara Control"), Zara Realty Holding Corp. ("Zara Realty"), and

Hillside Park 168 LLC ("Hillside Park") (collectively "Zara Defendants"), for their violations of

GBL § 349, and gross negligence,  alleges as follows:

### SUMMARY OF CLAIMS[1]

       This case epitomizes why attorneys are subject to the FDCPA. Although Zara

Defendants' notorious reputation proceeds it – with two active enforcement actions brought by

the New York State Attorney General's Housing Protection Unit for harassment and

---

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

overcharging tenants – the abusive scheme covered by this lawsuit necessitates the active participation of the Attorney Defendants.

After failing to secure a quick victory for Zara Defendants in two different housing court cases against Ms. Sattar in 2020 and 2023, on October 30, 2024, Attorney Defendants filed an action in Queens Supreme Court seeking the same rent arrears they were actively seeking on behalf of Zara Defendants in the two pending housing court cases. In addition, Attorney Defendants demanded an amount of rent arrears that it knew – or should have known – did not take into account the $21,900 in COVID-related Emergency Rental Assistance Program ("ERAP") Zara Defendants accepted, the New York State Division of Housing and Community Renewal ("DHCR") rent overcharge credit of $15,872.69, a pre-move in deposit of $6,897.60, and the DHCR rent reduction order which lowered Ms. Sattar's rent in her rent-stabilized apartment to $1,136.59.   Attorney Defendants demanded $80,557.74, not $20,115.34, the maximum Ms. Sattar may have actually owed.[2] In fact, in terms of the DHCR rent overcharge credit, Attorney Defendants only included the first two pages of DHCR's decision as an exhibit, not the full document which shows the $15,872.69 credit, deceiving both Ms. Sattar and the Queens Supreme Court.

A little more than a month later, December 6, 2024, Attorney Defendants filed another lawsuit against Ms. Sattar, in Queens Housing Court, demanding the same amount that it had demanded in the October 30 Queens Supreme Court case: $83,355.74.[3] Yet again, Attorney Defendants did not credit her account. If they had, the demand would be at most $22,388.52.

---

[2] This calculation of a maximum amount owed of $20,115.34 was made by an analysis by Ms. Sattar's counsel of the vastly contradictory documents produced by Defendants in the state court lawsuits and based on her own records. Because of the vast discrepancy between what Defendants say is owed and what the calculation of Ms. Sattar's attorneys show is owed, and other reasons, Ms. Sattar cannot come to an agreement to settle the debt.  Ms. Sattar, however, has been putting aside money to pay what is actually owed and to sign a new lease.

[3] This amount is slightly higher to take into account the two months of rent that had accrued since the filing of the Queens Supreme Court case.

The October 2024 and December 2024 lawsuits sought the same rent – plus much more – that Attorney Defendants sought in the pending 2020 and 2023 Housing Court cases. All four lawsuits sought the same months of rent (or use and occupancy) from February 2020 onward. Considering only the October and December 2024 cases, Defendants sought two judgments totaling $163,913.48, plus attorney's fees, when the amount actually owed as of December 6, 2024 was no more than $22,388.52, a near eight-fold increase. And part of the $141,52.964 -- $43,800 -- includes taxpayer funds of $21,900 *already* paid to landlord by the government through the ERAP program. Defendants seek to double-dip, taking taxpayer funds on the one hand and Ms. Sattar's money on the other to satisfy the same exact debt.

But there is still more. Each of the 2024 lawsuits sought money that was sought in the 2020 and 2023 housing court cases, which were still pending. The running balance of the 2020 and 2023 lawsuits would result in a demand for judgment of approximately $80,000 each by the time of the filing of the December 6, 2024 lawsuit. In sum, as of December 6, 2024, Defendants were seeking *four* judgments totaling approximately $324,000 plus attorney's fees and costs for a debt that could not have been more than $22,388.52.

Shocked and terrified upon learning of the 2024 lawsuits, Ms. Sattar filed and served *pro se* answers to these cases, losing wages and incurring transportation expenses in doing so. In just four years, Defendants have sued Ms. Sattar *four* times for rent or use and occupancy.[4]

Attorney Defendants' practice, here and in general, of filing multiple lawsuits over the same rental arrears is done with either wanton disregard for consumers' rights by failing to perform any meaningful attorney review of their client's files prior to filing lawsuits or is done

---

[4] In addition to these four lawsuits (three Queens Housing Court Cases and the one Queens Supreme Court Case), in 2022, Zara Defendants also sued Ms. Sattar in the commercial part of Queens Small Claims Court seeking attorney's fees, late fees and bank fees in connection with the putative underlying obligations sought in the four lawsuits. That case is still pending.

intentionally with the aim to illicitly increase the rental arrears, increase their attorneys' fees, and side step consumer protections in Housing Court like New York City's Right to Counsel (which does not operate in Supreme Court).

In light of the fact that Zara Defendants have been sued twice by the New York Attorney General for their abusive practices against tenants and have received sanctions from Queens Housing Court for their deception, Attorney Defendants have even more of a reason to review the Zara Defendants' files before filing to ensure the accuracy of those claims. Instead, Attorney Defendants are a mere rubber stamp, allowing false claims to be peddled in court, and abdicating their responsibility as attorneys and as officers of the legal system.

Since Defendants started using the courts as a weapon against Ms. Sattar in 2020, Ms. Sattar, a home health aide who lives alone, is constantly anxious, bursts into tears when she tells anyone what Zara Defendants and Attorney Defendants have done to her, is afraid of any knocks on her door in case it is another lawsuit, has had trouble sleeping, and her high blood pressure and hypertension have only gotten worse. The last two unnecessary and illegal lawsuits Defendants brought against her only exacerbated the situation. Ms. Sattar is terrified each time she is sued that she will lose her home of eight years. She fears and worries this continuous cycle of lawsuits, with her appearing in different courts on multiple cases, will never end.

While attorneys are advocates for their clients, they are also officers of the legal system, tasked with "a duty to uphold the legal process to demonstrate respect for the legal system; to seek improvement of the law; and to promote access to the legal system and the administration of justice." *See* Preamble: A Lawyer's Responsibility, New York Rules of Professional Conduct (2025).

Here, Attorney Defendants have blatantly failed to fulfil that role, unfairly and

unconscionably seeking to collect debts by filing multiple lawsuits and hiding key facts – such as amounts that should be credited to the account – from the court. Fortunately, the FDCPA prohibits such conduct.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to the FDCPA, 15. U.S.C. § 1692k(d), and under 28 U.S.C. § 1331.

2.      This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because they share a common nucleus of operative fact with the federal claim and are so related to the federal claim as to form part of the case or controversy under Article III of the United States Constitution.

3.      Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

4.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to Plaintiff's claims herein occurred within the Eastern District of New York.

## PARTIES

### *Plaintiff.*

5.      Plaintiff Saleha Sattar is a 57-year-old home health aide who lives at 88-15 168th Street, Apt. 5C, Jamaica, New York, 11432. She has lived in that apartment continuously from May 2017 to the present.

6.      Ms. Sattar is a "consumer" as that term is defined in 15 U.S.C. § 1692a(3) because she is alleged to owe a debt to Defendant Hillside Park 168 LLC, arising from putative residential rental arrears, sometimes referred to as use and occupancy, for Ms. Sattar's residence. Plaintiff's

alleged obligation is a "debt" as defined by 15 U.S.C. § 1692a(5) because it was incurred for family, personal, or household purposes.

### *Defendants.*

7.      Defendant Green & Cohen P.C. ("Green & Cohen") is a professional service corporation organized under the laws of the state of New York with a principal place of business at 319 East 91st Street, Professional Suite, New York, NY 10128. Green & Cohen has been Zara's law firm in its actions against its tenants since the death of attorney Curtis Harger in or around June 2023.

8.      Defendant Michael R. Cohen ("Mr. Cohen") is an individual residing in the state of New York. Mr. Cohen is the Green & Cohen partner who has signed all pleadings against Ms. Sattar since Mr. Harger's death and has substituted in as attorney for Zara Defendants in cases initiated by Mr. Harger.

9.      Green & Cohen with Mr. Cohen are collectively referred to as "Attorney Defendants."

10.     Attorney Defendants are the ones who signed and filed the two lawsuits against Ms. Sattar directly at issue in this complaint: *Hillside Park 168 LLC v. Saleha Sattar et al.*, Queens Supreme Court, Index No. 723023/2024 (filed on October 30, 2024) ("Supreme Court Case") and *Hillside Park 168 LLC v. Saleha Sattar et al.*, L&T-319345-24-QU (filed on December 6, 2024) ("2024 Housing Court Case").

11.     Defendant Zara Control, LLC ("Zara Control") is a foreign limited-liability corporation organized under the laws of the state of Delaware with a principal place of business at 166-07 Hillside Avenue, Jamaica, NY 11432. It is the parent company which controls all the various single-purpose ownership LLCs and Zara Realty.

12.     Defendant Zara Realty Holding Corp. ("Zara Realty") is a domestic business corporation organized under the laws of the state of New York with a principal place of business at 166-07

Hillside Avenue, Jamaica, NY 11432. It is the management company that manages Zara properties

13.    Defendant Hillside Park 168 LLC ("Hillside Park") is a limited-liability corporation organized under the laws of the state of New York with a principal place of business at 166-07 Hillside Avenue, Jamaica, NY 11432. It is the single-purpose entity which ostensibly owns Ms. Sattar's building and is named as the plaintiff in the various wrongful lawsuits against her.

14.    Throughout this complaint, Defendants Zara Control, Zara Realty, and Hillside Park are collectively "Zara Defendants."

15.    Attorney Defendants, collectively with the Zara Defendants are "Defendants."

## STATEMENT OF FACTS

### *Green & Cohen's instrumental role in Zara Defendants' real estate empire.*

16.    Based on Who Owns What, a website maintained by the non-profit JustFix and created to link landlord LLCs to their parent companies, Zara Defendants, through a family-run real estate business owns 45 buildings in Queens, New York, comprising 3,377 apartments.

17.    As of December 2023, Green & Cohen is Zara Defendants' attorneys of choice, handling all of Zara Defendants' cases including those brought in state supreme court, housing court or civil court. *See 57 Elmhurst LLC v. Morales*, 82 Misc.3d 1243(A), 209 N.Y.S.3d 827 *at* ftnt. 7.[5]

18.    Green & Cohen is a three-person shop whose office is located in a basement apartment of an old five-story apartment building on Manhattan's Upper East Side. *See* Website, Green & Cohen P.C. Its named partners are Jason M. Green and Michael R. Cohen, but it is Mr. Cohen who signs all of Zara Defendants' litigation papers.  Therefore, Green & Cohen is jointly and

---

[5] Zara Defendants typically use the same counsel for all their cases against tenants. Prior to 2023, it was a solo practitioner, Curtis Hager. *Id.* When he passed away in June 2023, Zara Defendants transferred their cases to Green & Cohen. *Id.*

severally liable for the acts of Mr. Cohen.

19.     Despite having three attorneys with Mr. Cohen appearing to handle all of Zara Defendants' legal proceedings against tenants, in 2024, Mr. Cohen filed or represented in 435 Queens Housing Court cases. Mr. Cohen is on par to reach similar record numbers in 2025, with 248 Queens Housing Court cases through October 20, 2025. These numbers do not take into account the cases that Mr. Cohen files in other boroughs or other courts.

20.     Even though Green & Cohen files the cases, upon information and belief, it fails to do the due diligence required to ensure there is not a fraud on the court or even reasonably review the Zara Defendants' allegations. This is not surprising given the volume of cases Mr. Cohen is filing in Queens Housing Court. But such a review is required by New York law. *See* 22 NYCRR § 130-1.1a[b]; *see also 57 Elmhurst LLC v. Morales*, 82 Misc.3d 1243(A), 209 N.Y.S.3d 827 *at* 12-13 ("Zara's attorneys too often seem to rubber stamp proposed filings, failing to exercise even a modicum of due diligence.").

21.     In light of Mr. Cohen's substantial caseload, and their conduct as to Ms. Sattar, Attorney Defendants do not and are not capable of conducting meaningful review of all the cases it commences or substitutes in for on behalf of Zara Defendants.

22.     Attorney Defendants' lack of due diligence is even more glaring in light of Zara Defendants' reputation for illegal conduct, including two actions brought by the New York State Attorney General against Zara Defendants for their illegal and harassing conduct toward rent-stabilized tenants (*see* ¶¶ 40-41; 100; 230, *infra*) and news coverage about tenants' protests against Zara Defendants. *See, e.g.*, *Queens residents in rent-stabilized buildings take aim at Zara Realty, claim tenant abuse*, CBS NEWS (July 31, 2023).

23.     Without Attorney Defendants and their complicity, Zara Defendants would not be able to

engage in such widespread "lawfare" – using legal proceedings and the legal system to illegally harass tenants – against largely low-income and immigrant tenants. In essence, Attorney Defendants use their bar license as a weapon against tenants.

24.    In The Legal Aid Society's ("LAS") representation of Ms. Sattar in Queens Housing Court, Green & Cohen rarely appears. Instead, they send a "per diem" attorney to cover the case.

25.    Per diem attorneys are common in New York state courts, in particular in housing court and civil court, but some appear in supreme court.

26.    Unfortunately, per diem attorneys rarely, if ever, move a case forward. They are hired by the attorney of record, not the plaintiff or petitioner. They are hired solely for the appearance, and are paid by appearance. As a result, they usually do not have client contact and only know the basics of the case.  They are there merely to ensure that the attorney of record is not defaulted. *See* New York State Bar Association, Committee on Professional Ethics, *Ethic Opinion 1113*, Para 10 (Jan. 10, 2017).

27.    If Green & Cohen does appear, usually Zara Realty employee Daniel DeCastro appears as well. Mr. DeCastro is not an attorney, but based on LAS's experience, it is Mr. DeCastro who runs the case.

28.    Green & Cohen has given LAS attorneys consent to communicate directly with Mr. DeCastro, and in court and over email, LAS attorneys attempt to negotiate housing court cases with Mr. DeCastro and engage in legal discussions with Mr. DeCastro. Mr. Cohen is CC'ed on the emails but usually remains silent.

29.    It is also not uncommon for a stipulation, although signed by Green & Cohen, to have a hand-written comment on the top left of the first page that states "OK DD" or "Ok per Daniel" meaning the stipulation was approved by Daniel DeCastro.

30.     Mr. DeCastro is usually the notary who notarizes the Zara Defendants' verifications and other court-related documents, and in small claims court actions, he represents the Zara Defendants.

31.     Green & Cohen has all but abandoned the practice of law when it comes to the Zara Defendants.

32.     Upon information and belief, this is how Green & Cohen acts in all cases where it represents Zara Defendants.

33.     Based on LAS' experience, this reverse attorney-client relationship, where the client manages almost all aspects of the case and the attorney is merely a rubber stamp, is unique to the Zara Defendants.[6]

### *The Zara real estate empire.*

34.     The vast majority of Zara Defendants' 45 apartment buildings are located in the Jamaica and Hollis areas of Southeast, Queens, neighborhoods that are majority Black but with a growing South Asian and Indo-Caribbean immigrant population. Zara Defendants own a handful of apartment buildings in the Elmhurst area where the population is primary Latino and East Asian and in Flushing, an East Asian-dominant community.

35.      Hillside Park owns the property located at 88-15 168th Street, Jamaica, New York ("the Property").

36.     However, Hillside Park is not an independent entity.  It is merely a single purpose entity ("SPE") that was created solely to own the Property.  All of Zara Defendants' properties are

---

[6] Queens Housing Court has raised the possibility that Zara Defendants have engaged in the unauthorized practice of law. After its in-house counsel, Curtis Harger passed away in June 2023, e-filings were still being made under his name even though there is a way for a third-party, non-attorney to file and identify themselves. Some of these filings were to commence new eviction proceedings. *57 Elmhurst LLC v. Morales*, 82 Misc.3d 1243(A), 209 N.Y.S.3d 827 *at* ftnt. 21.

owned through different SPEs.

37.     It is Zara Control, formed in 2010 by three brothers, that manages and runs Hillside Park and all the other SPEs. Zara Control is Hillside Park's sole manager and as a result, signs mortgages and other documents for Hillside Park.

38.     Zara Control is managed by a Board of Managers and each manager is also an employee of Zara Realty.

39.     Zara Realty is Hillside Park's management company and in fact is a managing company for the majority of Zara Defendants' properties.[7]

40.     While the Zara Defendants are not Queens' largest landlord, it is one of the borough's most notorious, due to two New York State Attorney General ("NYAG") actions filed against them: *New York State Division of Housing and Community Renewal et al. v. Zara Realty Holding Corp. et al.*, N.Y. Supreme, Ind. No. 450245/2019 (filed Mar. 1, 2019) ("NYAG 2019 Action") and *New York Attorney General et al. v. Rajesh Anthony A/K/A Tony Subraj et al.*, N.Y. Supreme, Ind. No. 452265/2025 (filed Aug. 7, 2025) ("NYAG 2025 Action").

41.     In the NYAG 2025 Action, the NYAG raised Ms. Sattar's case of an example of the Zara Defendants' ignoring a New York State Division of Housing and Community Renewal ("DHCR") rent reduction order. *See* Compl., ¶¶ 224-27, in the NYAG 2025 Action. Instead of following DHCR's April 16, 2024 order which froze Ms. Sattar's rent at $1,136.59, in two separate, subsequent suits against her, one in Queens Supreme Court and one in Queens Housing Court, Zara Defendants continue to demand the unlawful rent of $1,399, the rent DHCR specifically rejected. *Id*.

42.     Additionally, Queens Housing Court has recently found Zara Defendants' behavior – in

---

[7] The Zara Empire also consists of two other family-owned property management companies: Belair Park 5 LLC and Jamaica Management LLC.

particular its failure to abide by the law – sanctionable:

> "The court recognizes that a fine of $5,000 will have no meaningful financial impact on a landlord of Zara's size, however it is the court's hope that it will accomplish what its prior admonitions and orders have not: respect for the court, the rule of the law, and tenants in Zara's buildings, the vast majority of whom typically navigate housing court without the benefit counsel. If instead Zara continues to submit materially false or misleading papers that fail to comply with the RSL or other laws, the court will not hesitate to impose additional sanctions up to the $10,000 maximum per occurrence as authorized by 22 NYCRR § 130-1.2 *57 Elmhurst LLC v. Morales*, 82 Misc.3d 1243(A), 209 N.Y.S.3d 827 (Queens Civil Court, L&T Ind. No. 31-271-23-QU May 7, 2024).

43.    Among the Zara Defendants, there is a symbiotic relationship with each economically benefiting from this relationship. Zara Control and Zara Realty control the conduct of the SPEs, including Hillside Park, Zara Control managers serve as Zara Realty employees, Karran "Kenneth" Subraj and Rajesh A. ("Tony") Subraj, two Zara Control managers, initiate collection proceedings stating that they are members of the SPE, Zara Control signs property-related documents on behalf of the SPEs, and all share an address at 166-07 Hillside Ave., Jamaica, NY 11432.

44.    The Zara Defendants have admitted to this agency relationship. In its Notice of Failure to Pay sent to Ms. Sattar prior to bringing its non-payment housing court case, Zara Realty stated that there is an agency relationship with Hillside Park.  *See* Petition, p. 7 in *Hillside Park 168 LLC v. Saleha Sattar et al.*, L&T Ind. No. 301177-23-QU (filed Jan. 18, 2023).

45.    Similarly, even though Ms. Sattar's lease is with Hillside Park, it was Zara Realty that deducted the monthly rent amount from her bank account.

46.    This agency relationship is not unique to Hillside Park but is how Zara Realty controls all the SPE "landlords." Many, if not all of Zara Defendants' nonpayment housing cases include a SPE "landlord" bound by a similar agency relationship. For example, a random sampling of non-

payment housing court cases filed in the name of various SPE "landlords" reveal that every Notice of Failure to Pay or rent demand in those cases explicitly states there is an agency relationship them and Zara Realty.

47.   The Zara Defendants have ratified, approved of, and assumed responsibility for the conduct of the other Defendants and their agents.

48.   At all relevant times, the Zara Defendants acted on behalf of and for the benefit of each other by using deceptive and fraudulent means in collecting past due rents.

### *Ms. Sattar signs a lease and is entitled to a $6,874.60 credit, not reflected in later lawsuits.*

49.   Saleha Sattar, a 57-year-old home health aide, moved to the United States from Bangladesh in 2010. Her husband is still in Bangladesh and her son lives in Australia. As a result, Ms. Sattar is without family in New York City, lives alone, and relies on the kindness of her friends and strangers in the Bangladeshi community.

50.   In or around February 2017, Ms. Sattar began looking for an apartment in Queens for herself.

51.   With limited English and unaware of Zara Defendants' negative reputation, Ms. Sattar began looking at apartments in the building located at 88-15 168th Street, Jamaica, NY 11432.

52.   The Zara Defendants required Ms. Sattar to pay a $200, non-refundable application fee which she paid on February 10, 2017.

53.   In order to rent in the building, the Zara Defendants required Ms. Sattar to make three payments on March 28, 2017: one in the amount of $1,399; one in the amount of $4,220; and one in the amount of $6,874.60. Ms. Sattar's understanding was that the $1,399 was one month's security deposit and the other two payments – totaling $11,094.60 – were deposits which Zara Defendants would deduct from to pay the monthly rent. At $1,399 of monthly rent, the

$11,094.60 would cover over seven months of rent. Unfamiliar with New York State housing law, Ms. Sattar was unaware that New York law does not allow these types of "advance rent payments" for rent-stabilized apartments; only one month is permitted. *See* Rent Stabilization Code § 2525.4.

54.     In sum, Ms. Sattar is entitled to a credit of a $6,874.60. However, Defendants will not reflect this credit in any of the four collection lawsuits later filed.

55.     On or around May 1, 2017, Ms. Sattar signed a two-year lease for a rent-stabilized apartment located at 88-15 168th Street, Jamaica, NY 11432, Apartment 5C ("the Apartment").

56.     Even though Ms. Sattar's monthly income was sufficient to cover the monthly rent of $1,399, the Zara Defendants required her to find a guarantor. With no family in New York, Ms. Sattar was scared that she would be unable to find a guarantor. Luckily, a local community member, Sarowar Hossaine, was willing to serve as a guarantor so that she could have a place to live.

57.     Ms. Sattar moved into the Apartment on or around May 1, 2017 and signed a form so that the rent could be debited from her TD Bank account once the $11,094.60 deposit was exhausted. With rent at $1,399, the $11,094.60 meant that Zara Defendants would not start deducting the monthly rent until February 2018.

58.     However, on or around August 1, 2017, the Zara Defendants started deducting $1,399 from Ms. Sattar's TD Bank account. Although Zara Defendants informed Ms. Sattar that the $11,094.60 deposit would be used for future rent payments, Zara Defendants only credited Ms. Satter's May, June and July 2019 rental payments, a total of $4,197.

59.     While continuing to pay her rent, Ms. Sattar filed a rent overcharge complaint with the New York State Division of Homes and Community Renewal ("DHCR") in March 2018

("DHCR Complaint"). Ms. Sattar alleged that Zara Defendants charged her too much prior to and upon lease signing (e.g. the $11,094.60 "deposit") and charged her rent exceeding what was permitted under New York's Rent Stabilization Code. Although Ms. Sattar knew she was being overcharged, she continued to pay her rent.

60. Before her lease was set to expire in or around April 30, 2019, Ms. Sattar sought to sign a renewal lease with the Zara Defendants. In 2018 and 2019, Ms. Sattar was on firmer financial footing, with an average gross monthly income of $6,000 during those two years. She had also never missed a rent payment. Thus, she requested that the renewal lease not include a guarantor.

61. In early 2019, Zara Defendants agreed to allow Ms. Sattar to renew the lease without a guarantor if she submitted something in writing with that request and explaining why a guarantor was no longer necessary.

62. On or around February 6, 2019, Ms. Sattar submitted that document to the Zara Defendants. However, the Zara Defendants suddenly rejected her request and informed her that a guarantor was needed to sign the renewal lease.

63. In or around February 2020, Zara Defendants began rejecting her rent payments by returning the direct debit and have refused to accept any payment since then.

***Zara Defendants file their first action.***
***("2020 Housing Court Case")***

64. On February 18, 2020, Zara Defendants sued Ms. Sattar in Housing Court in the action *Hillside Park 168 LLC v. Saleha Sattar et al.*, L&T- 53103-20-QU ("2020 Housing Court Case") on the basis that Ms. Sattar did not sign a renewal lease. Zara Defendants' petition fails to mention the reason why: that Zara Defendants had reneged on their promise not to seek a

guarantor.[8] Zara Defendants brought the 2020 Housing Court Case as a holdover proceeding.

65.    In New York City housing court, landlords can bring two types of actions, a "nonpayment proceeding" or a "holdover proceeding."  In a nonpayment proceeding, the landlord is only seeking rent arrears and any missed rental payments, including those in the past (prior to filing) and those in the future (since the filing). In a holdover proceeding, the landlord is seeking to evict the tenant. However, the landlord often also seeks the missed monthly rent payments, if any, as a secondary request in these holdover proceedings. In a holdover proceeding, the landlord uses the term "use and occupancy" to refer to these missed monthly payments. Like in a nonpayment proceeding, the landlord will seek use and occupancy payments from the filing of its holdover proceeding through the entry of judgment.

66.    Similarly, in addition to seeking to evict Ms. Sattar, Zara Defendants also demanded "use and occupancy" from February 2020 – the date when Zara Defendants stopped accepting Ms. Sattar's rent – to whenever the 2020 Housing Court Case concluded.

67.    For the purposes of this complaint, "rent arrears" and "use and occupancy" are used interchangeably.[9] Landlord attorneys generally, including Attorney Defendants specifically, use these terms interchangeably in their housing court papers, often requesting "rent/use and occupancy."

68.    With New York City's Right to Counsel program, a city-sponsored program that provides a free legal services attorney for tenants below a certain income threshold, Ms. Sattar was assigned LAS to represent her.

---

[8] The 2019 renewal lease was also not based on the $1,399 legal rent but rather a higher, unlawful rent. As a result, Ms. Sattar was not obliged to sign the renewal lease on that basis alone. Also, in light of the fact that Zara Defendants filed the 2020 Housing Court Case on this higher, unlawful rent, that action was legally baseless.

[9] There is a small technical difference. Where there is no lease in effect, a landlord cannot bring a nonpayment action that seeks rent arrears since a nonpayment action must be based on a lease. However, where there is no lease, a landlord can still seek "use and occupancy" through a holdover proceeding.

69.     However, with the COVID-19 pandemic, the 2020 Housing Court Case was stayed.
When the COVID-related Emergency Rental Assistance Program ("ERAP") was rolled out in
2021 by the Office of Temporary and Disability Assistance ("OTDA"), Ms. Sattar applied for
ERAP.

70.     In April 2022, Ms. Sattar was awarded $21,900 by ERAP which was paid directly to the
Zara Defendants and put toward 15 months of rental arrears at a monthly rental rate of $1,460.
The 15 months covered were for March 2020 through February 2021 and then May 2021 through
June 2021. *See* **Exhibit 1** (ERAP Approval Notice).[10]

71.     On December 5, 2022, the Zara Defendants filed a cross-motion in the 2020 Housing
Court Case requesting that Ms. Sattar pay the rent arrears that accrued since March 2020 and for
her to pay *pendente lite*. *See* Affirmation of Curtis Harger, dated Dec. 5, 2022, p. 5, in 2020
Housing Court Case (". . .requires respondent to pay post-litigation rent/use and occupancy
starting with the month of March 1, 2020 and to pay petitioner pendente lite rent and/or use and
occupancy in the amount of $1,460 per month. . . until the resolution of this litigation. . . .).
Although the 2020 Housing Court Case was originally filed by attorney Curtis Harger, on July
13, 2023, Attorney Defendants substituted in as the Zara Defendants' attorney due to Mr.
Harger's passing the month before.

72.     Ms. Sattar's attorneys, LAS, opposed the Zara Defendants' cross-motion and on June 14,
2024, the Housing Court Judge denied the Zara Defendants' cross-motion, and set the matter
down for trial.

73.     As discussed below, on October 30, 2024 and December 6, 2024, Attorney Defendants
filed two lawsuits, in Supreme Court and Housing Court, respectively, not only for the same
debt, but also for the same debt as in the 2020 Housing Court Case.

---

[10] All exhibits and hyperlinked documents are incorporated by reference in their entirety.

17

74.     Finally, on May 21, 2025, Ms. Sattar and Attorney Defendants stipulated to discontinue the 2020 Housing Court Case without prejudice, agreeing to continue the claims in the October 2024 Housing Court Case, *Hillside Park 168 LLC v. Saleha Sattar*, L&T-319345-24-QU.  *See* Stipulation to Discontinue – So Ordered, in 2020 Housing Court Case.

### *Zara Defendants file their second action, seeking double judgment from the 2020 action*. ("2023 Housing Court Case")

75.     While their motion seeking eviction and use and occupancy in the 2020 Housing Court Case was pending, on January 18, 2023, Zara Defendants filed a second housing court case: *Hillside Park 168 LLC v. Saleha Sattar et al.,* L&T-301177-23-QU ("2023 Housing Court Case").

76.     The case was filed by Curtis Harger. However, on June 27, 2023, Attorney Defendants substituted in as attorneys for the Zara Defendants due to Mr. Harger's passing.

77.     The 2023 Housing Court Case was a nonpayment proceeding seeking the rent arrears from August 2021 onward and also three random months before August 2021: February 2020, March 2021, and April 2021 at a monthly rate of $1,460.00 for a total of $29,200.

78.     The $1,460 monthly rent demand was unlawful, as there was no lease in effect for this amount; additionally, only three months prior, in March 2021, DHCR had issued a rent reduction order which lowered Ms. Sattar's rent to $1,136.59 and set it there until Zara Defendants corrected the problems in the building.

79.     While Attorney Defendants took the case six months after it was filed, they still had an obligation to review the matter and ensure that the appropriate amounts were being sought. To the extent that it was not, attorneys are obligated to correct the record. *See* Rule 3.3, New York Rules of Professional Conduct (2025).

80.     With overlapping claims, LAS took on representation of Ms. Sattar in the 2023 Housing

Court Case under New York City's Right to Counsel program.

81.     Through a motion to stay the action, LAS brought it to the housing court's attention that Zara Defendants had already sued Ms. Sattar in the 2020 Housing Court Case and was currently pursuing an order for use and occupancy for the same time period as the time period sought in the 2023 Housing Court Case.

82.     On March 26, 2024, Queens Housing Court stayed the 2023 Housing Court Case pending the outcome of the 2020 Housing Court Case. *See* [Mar. 26, 2024 Decision/Order](#), in 2023 Housing Court Case.

83.     Critically, in the Order the Court acknowledged that Defendants were seeking a double judgment for the same debt. "Respondent aptly notes that if petitioner's cross-motion is successful, there is the risk that it could have *two judgments* against her for the *same subject matter*." *Id*., p. 2 (emphasis added).

84.     As of the date of the filing of this Complaint, the 2023 Housing Court Case is still an active case although stayed.

***DHCR finds that the Zara Defendants overcharged Ms. Sattar, reducing by $15,872.69 the amount for which they could sue Ms. Sattar, and yet Attorney Defendants later sue for this amount.***

85.     On April 16, 2024, DHCR issued a decision on Ms. Sattar's 2018 DHCR Complaint (*see* ¶ 59, *supra*), finding that the Zara Defendants had in fact overcharged Ms. Sattar in the amount of $15,872.69. ***See* Exhibit 2** ("DHCR Decision"). DHCR found that Ms. Sattar had overpaid $10,428.02 in rent and $679.13 in security deposit. Additionally, DHCR awarded treble damages totaling $4,765.54. *Id.* It also ordered that the legal rent be reduced and that her next renewal lease must use $1,399.00 as the base rent. DHCR also cited a Rent Reduction order issued March 23, 2021 freezing the collectable rent to $1,136.59 effective retroactively to March 2019 and

going forward until it lifts the rent reduction order. *Id.* This rent reduction is due to Zara Defendants' failure to provide certain guaranteed amenities to its tenants. Furthermore, because of the overcharge, ERAP paid funds in excess of what Zara Defendants were entitled to for the months of March 2020 to July 2021 and ordered a refund of $4,851.15 to ERAP. DHCR lastly ordered that the overcharge award be used as a refund and offset the rental arrears. *Id.*

86.     By this point, Attorney Defendants were fully integrated as Zara Defendants' attorneys of choice and knew of – or should have known of – the DHCR Decision.

87.     On May 28, 2024, the Zara Defendants, through a Petition for Administrative Review ("PAR"), appealed DHCR's overcharge decision only with respect to the treble damages. The Zara Defendants did not contest the base rent overcharge decision nor the rent reduction order. On January 21, 2025, DHCR denied the Zara Defendants' appeal. ***See*** **Exhibit 3** (DHCR PAR Decision).

88.     On May 21, 2025, Zara Defendants filed an Article 78 appealing the PAR: *In The Matter Of The Application Of Hillside Park 168 LLC, for a Judgment Pursuant to Article 78 of the Civil Practice Law and Rules v. New York State Division Of Housing And Community Renewal*, Queens County Supreme Court, Index No. 708258/2025 ("Article 78 Proceeding").

89.     The Zara Defendants are represented by Borah, Goldstein, Altschuler, Nahins & Goidel, P.C. in the Article 78 Proceeding.

90.     As of the date of the filing of this complaint, the Article 78 Proceeding is in motion practice.

***Defendants file a <u>third</u> action on October 30, 2024, this time in Queens Supreme Court Queens Court, seeking a <u>Triple</u> Judgment from the amount sought in the pending 2020 and 2023 Housing Court Cases – plus additional hugely inflated amounts***
("October 30, 2024 Supreme Court Case").

91.     While their 2020 and 2023 housing court cases were pending, on October 30, 2024, the

Zara Defendants initiated another action seeking rent arrears, this time in Queens Supreme Court, alleging that Ms. Sattar owed $80,557.74 plus attorney's fees and costs, and additional rental arrears that might accrue from the filing of suit through the entry of judgment. *See* Compl., ¶ 8, in *Hillside Park 168 LLC v. Saleha Sattar et al.*, Queens Supreme Court, Index No. 723023/2024 ("October 30, 2024 Supreme Court Case"). ***See also*** **Exhibit 4** (October 30, 2024 Supreme Court Petition, Ledger, and Partial DHCR Decision.)

92.     The October 30, 2024 Supreme Court Case was filed by Green & Cohen and signed by Mr. Cohen.

93.     Based on the rent ledger attached to the complaint, the Defendants allege that "use and occupancy" first came due in February 2020 and a rent payment has not been made since. *See* Compl., Ex. 2, in October 30, 2024 Supreme Court Case.

94.     The Defendants also contend that based on the DHCR order, the monthly rent charged for that time period is $1,399. Compl., ¶ 6, in October 30, 2024 Supreme Court Case.

95.     Although Defendants do not explain their math in the October 30, 2024 Supreme Court Case, to get to a rental balance of $80,557.74, Defendants would have to demand $1,399 per month for approximately a little more than 57 months.[11] The period of February 2020 to October 30, 2024 would be a little more than 57 months of rental payments.

96.     Defendants' demand of $80,557.74 does not take into account the following: (i) the $21,900 that Zara Defendants received from ERAP in or around March 2022; (ii) the rent overcharge credit of $15,872.69 from the April 2024 DHCR Decision; and (3) the fact that the DHCR Decision also reduced Ms. Sattar's rent to $1,136.59.

---

[11] Fifty-seven months of rental payments at $1,399 would be $79,743.  Upon information and belief, Defendants' demand takes into account the extra days between October 1, 2024 and when it filed the complaint, October 30, 2024.

97.     At the time of filing of the October 30, 2024 Supreme Court Case, Defendants knew it was not crediting the ERAP payments. First, it makes no mention of the ERAP payments in the complaint.[12] Second, in the 2023 Housing Court Case, where Green & Cohen eventually represents Zara Defendants, the petition acknowledges the $21,900 ERAP payment and only seeks $29,000.

98.     As for the DHCR Decision, Defendants completely hide the ball from the Supreme Court as well as from Ms. Sattar by pretending that the only thing that the DHCR Decision did was to set a rent reduction to $1,399. *See* Compl., ¶ 6, in Supreme Court Case.

99.     Furthering their duplicitous behavior, Defendants only attach a portion of the DHCR Decision. They fail to attach the necessary calculation footnotes. *See* Compl. Exhibit 3, in October 30, 2024 Supreme Court Case. But it is these calculation footnotes that show that the overcharge amount of $15,872.69 is to be credited to Ms. Sattar's rent balance (**Exhibit 2**, DHCR Decision, p. 5, upper right corner) and that while the legal regulated rent is $1,399, a rent reduction order is in effect which froze Ms. Sattar's rent to $1,136.59.[13] (*Id.*, p. 8).

100.    In the NYAG 2025 Action, even the NYAG noted Defendants' strategic failure to include the entire DHCR Decision as an exhibit to the Supreme Court Case. *See* Petition., ¶¶ 226-27, in the NYAG 2025 Action.

101.    Interestingly, in the Article 78 Proceeding filed seven months earlier, Zara Defendants do include the entire DHCR Decision. *See* Petition, Exhibit B, in the Article 78 Proceeding.

102.    Defendants have yet to correct their Exhibit 3 attached to the October 30, 2024 Supreme

---

[12] The ERAP payments do appear in the rent ledger, which is Exhibit 2 to the Summons and Complaint. However, the amount that is sought in the complaint does not properly credit the ERAP payments to Ms. Sattar's alleged balance.

[13] A rent reduction order freezes rent at a lower amount than what is the legal regulated rent to penalize the landlord for not offering all the amenities to tenants to which they are entitled. If Zara Defendants corrected the issues related to the rent reduction order, Ms. Sattar's rent would increase – after DHCR confirms the issues had been corrected – to the legal regulated rent. Until that happens, Ms. Sattar's rent balance should be calculated at $1,136.59 per month.

Court Case complaint and replace it with the entire DHCR Decision.

103.    Further, Ms. Sattar also has a balance of $6,897.60 from the $11,094.60 deposit she made in or around March 28, 2017 prior to moving into the Apartment that Defendants have yet to credit to her account.

104.    Accounting for ERAP, the DHCR Decision overcharge credit and the 2017 deposit, when Defendants filed the October 30, 2024 Supreme Court Case, Ms. Sattar owed at most $20,115.34, not the $80,557.74 that Defendants demand.

105.    Defendants also seek legal fees and costs in the October 30, 2024 Supreme Court Case. *See* Compl., Wherefore ¶, in October 30, 2024 Supreme Court Case. However, in 2022, Zara Defendants sued Ms. Sattar in the commercial division of small claims court for attorneys' fees. This small claims case is still pending. When Attorney Defendants filed suit in in October 2024 they made a demand for attorney's fees. Consequently Attorney Defendants were double dipping for attorney's fees: they were seeking attorney's fees sought in whole or in part in the pending Zara 2022 small claims action.

106.    Unsurprisingly, in their October 30, 2024 Supreme Court complaint Attorney Defendants make no mention of their pending 2020 and 2023 cases in housing court.

107.    As if suing Ms. Sattar multiple times was not sufficient, Defendants humiliated her by plastering her door over multiple days with the rent ledger – showing missed monthly payments – and eventually the summons and complaint. Zara Defendants' version of the Scarlet Letter.

108.    On October 25, 2024, five days before suing her in Queens Supreme Court, Defendants had the below rent ledger affixed to Ms. Sattar's apartment door.



109.    Likely seeing that Ms. Sattar removed the rent ledger from her door, on October 29, 2024, Defendants reposted the rent ledger to her door so her neighbors could continue to see her missed payments:



110.    Likely after again seeing that Ms. Sattar had taken down the rent ledger from the outside

of her door, on October 30, 2024, Defendants taped the rent ledger again to her door:



111.    On October 30, 2024, Defendants finally taped the summons and complaint to Ms.

Sattar's apartment door with a big piece of silver electrical tape:



112.    On October 31, 2024, Defendants not only had the summons and complaint attached to her door, they also dropped another copy of the rent ledger in the hallway in front of her apartment door:



113.    Ms. Sattar's last day of public humiliation was on November 4, 2024 when the Defendants had two copies of the summons and complaint plastered to her door:



114.    As a woman who lives alone with family abroad, it also scared her and over the course of that week in late October, early November, Ms. Sattar suffered extreme panic attacks.

115.    As soon as Ms. Sattar received the Supreme Court Case papers, she called her housing counselor at Chhaya. Chhaya is a community development corporation nonprofit located in the Jackson Heights neighborhood of Queens. It provides housing and economic justice services largely to the immigrant communities of Queens. Ms. Sattar has been working with Chhaya for a number of years due to its work organizing tenants in Zara Defendants' buildings throughout the borough.

116.    Ms. Sattar's Chhaya housing counselor told her to go to Queens court to answer the Supreme Court Case complaint.

117.    In early to mid-November, Ms. Sattar took a day off from work and took the bus from her home to Queens court to answer the complaint. However, she did not understand that she had to go to the Queens Supreme Court building and instead went to the Queens Housing Court

building where she had been before. When she was finally able to speak to someone, the clerk informed her that she had to go to the Supreme Court building across the street. Ms. Sattar did go to the Supreme Court building but because it was late afternoon and the Queens Supreme Court building was in the process of closing, she was unable to file an answer. She took the bus back home.

118.    On another day in early November, Ms. Sattar again took the day off from work, taking the bus to Queens Supreme Court.  Ms. Sattar was able to obtain advice and obtained the *pro se* answer form from the *pro se* office. Ms. Sattar took the answer form home to answer it. She again took the bus home.

119.    On a third day in November 2024, Ms. Sattar returned to Queens Supreme Court to file her filled-out *pro se* answer. The clerk informed her that she had to serve the answer on Green & Cohen, and for some reason the clerk who was assisting her told Ms. Sattar that the answer had to be served on the attorney in person by someone other than herself.[14] Ms. Sattar took the bus back home with the filled out *pro se* answer form and tried to find someone who could help her serve the answer to Green & Cohen's office in Manhattan.

120.    Without family to help her, Ms. Sattar had to again expose her personal matters to a friend. Although embarrassed, she was left with no choice but to reach out to one of the few friends she has from the community and ask her to go with her to Manhattan to serve the answer. Even though this friend was recuperating from an injured leg, she agreed to take public transportation into Manhattan with Ms. Sattar to serve Green & Cohen.  Ms. Sattar felt horrible asking this friend to help her, but she did not know what else to do.

121.    On November 18, 2024, Ms. Sattar and her friend took the subway to Manhattan's Upper

---

[14] Personal service of an answer is not necessary under New York law; mailing it to the plaintiff's attorney is sufficient. But it does have to be mailed by someone not a party to the case.

East Side, and her friend served Green & Cohen. Ms. Sattar took another day off from work to do this.  In addition to paying for herself, Ms. Sattar also paid her friend's subway fare both ways.

122.    On November 19, 2024, Ms. Sattar took the bus to Queens Supreme Court and filed the affidavit of service with Queens Supreme Court.  She took the bus home.

123.    Unlike housing court, there is no Right to Counsel program in any of New York City's Supreme Courts, including Queens, and Ms. Sattar was not guaranteed free legal representation.

124.    However, in April 2025, LAS' Consumer Rights Project agreed to represent Ms. Sattar in the Supreme Court Case.

125.    On April 23, 2025, Ms. Sattar took another day off from work to come to LAS' offices to review and sign her affirmation for her motion to dismiss the October 30, 2024 Supreme Court Case complaint, on the grounds that other actions – namely the two prior Housing Court Cases and the subsequent one – were pending between the same parties for the same cause of action and the same relief.

126.    On April 24, 2025, LAS filed that motion to dismiss the October 30, 2024 Supreme Court complaint.

127.    Attorney Defendants opposed the motion on May 15, 2025, and on June 20, 2025, LAS replied to Attorney Defendants' opposition. The motion was marked fully submitted on July 22, 2025. As of the date of the filing of this complaint, Queens Supreme Court has yet to issue a decision on the motion.

***Defendants file a <u>fourth</u> action on December 6, 2024 seeking a <u>Quadruple</u> Judgment from the amounts sought in the 2020 and 2023 Housing Court Cases and the hugely inflated amounts sought the five weeks before in the October 30, 2024 Supreme Court Case.***
("December 6, 2024 Housing Court Case").

128.    On December 6, 2024, just a little over a month after filing the October 30, 2024 Supreme Court Case, Defendants sued Ms. Sattar again in a third housing court case: *Hillside Park 168 LLC v. Saleha Sattar et al.*, L&T-319345-24-QU ("December 6, 2024 Housing Court Case"). ***See also* Exhibit 5** (December 6, 2024 Housing Court Petition).

129.    Attorney Defendants filed the petition on behalf of the Zara Defendants and continue to represent them in the December 6, 2024 Housing Court Case.

130.    Although the December 6, 2024 Housing Court Case is a holdover proceeding, Defendants specifically state the precise use and occupancy it seeks, which is same amount of rent it sought in the Supreme Court Case plus the two additional months of use and occupancy that had accrued since the filing of the Supreme Court Case: $83,355.74.[15] *See* Petition, ¶ 13, in the December 6, 2024 Housing Court Case. Additionally, in the "Wherefore" paragraph of the Petition, Defendants' demand covers the same time period for use and occupancy as it does in the Supreme Court Case: February 2020 to the present. *See* Petition, Wherefore ¶, in December 6, 2024 Housing Court Case.

131.    Again, Defendants ignore the DHCR Decision which reduced the rent/use & occupancy that Zara Defendants could charge Ms. Sattar to $1,136.59.  Instead, Defendants falsely claim that the collectible rent is $1,399. *See* Petition, ¶ 13, in December 6, 2024 Housing Court Case.

132.    Defendants did not allegedly serve Ms. Sattar until the end of January 2025, with the final attempt allegedly being on January 27, 2025 by affixing the petition to Ms. Sattar's door. Allegedly a copy of the petition was mailed to Ms. Sattar on the same day. *See* Affidavit of Service, in December 6, 2024 Housing Court Case.

---

[15] The October 30, 2024 Supreme Court Case was filed on October 30, 2024 and thus includes use and occupancy from February 2020 through and including October 2024 for a total of $80,557.74.  The December 6, 2024 Housing Court Case was filed on December 6, 2024 and as a result, an additional two months – November 2024 and December 2024 – was added to the demand: $80,557.74 + $1,399 + $1,399 = $83,355.74.

133.    When Ms. Sattar learned of the December 6, 2024 Housing Court Case, she was once again scared that she would lose her home. She also did not understand why she was receiving more papers related to her tenancy. She again felt humiliated.

134.    Upon receiving the 2024 Housing Court Case papers, Ms. Sattar texted her Chhaya housing counselor asking her what she should do. Her Chhaya housing counselor told her she would have to go to Queens Housing Court again to file an answer.

135.    On or around February 10, 2025, Ms. Sattar took a day off from work and got on the bus to go to Queens Housing Court. In her answer she again stated that Zara Defendants have multiple active cases against her based on the same causes of action as the December 6, 2024 Housing Court Case. *See* Sattar Answer, in December 6, 2024 Housing Court Case. After filing her answer, she took the bus back home, and paid for transportation each way.

136.    In April 2025, Ms. Sattar retained LAS to represent her in the December 6, 2024 Housing Court Case.

137.    On July 1, 2025, LAS filed a motion to amend Ms. Sattar's answer, a motion that is still pending. *See* Motion to Amend Answer (Mot. Seq. #1), in December 6, 2024 Housing Court Case.

138.    As a result of LAS's advocacy, Zara Defendants have finally offered Ms. Sattar a renewal lease without the need for a guarantor, with the correct rental amount if and when the rent reduction order is lifted. This is a request Ms. Sattar made back in 2019. *See* Sept. 4, 2025 Stipulation, in December 6, 2024 Housing Court Case.

139.    Because this is a rent-stabilized apartment, two leases had to be offered in order for the current lease to step up to the legal rent. Defendants provided a one-year lease covering August 1, 2024 to July 31, 2025 at $1,440.97 per month which shows the proper step-up from the $1,399

rent. The second lease covers August 1, 2025 to July 31, 2027 at $1,516.62 per month, which again shows the proper step-up from the $1,440.97 rent.

140.    But again, until Zara Defendants rectify the building-wide issues, the March 2021 DHCR rent reduction is still in effect, and Ms. Sattar only has to pay $1,136.59.

141.    On Sept. 18, 2025, Ms. Sattar signed both renewal leases and of September 29, 2025, Defendants executed the two leases. Defendants emailed the 2025 lease to LAS on or around October 20, 2025.

142.    Although the issue of the renewal lease without a guarantor has finally been settled, Defendants are still contesting what Ms. Sattar owes and are still not crediting her account properly.

143.    As of September 4, 2025, Defendants state that what Ms. Sattar owes is much less than what it demanded in the October 30, 2024 Supreme Court Case complaint or the December 6, 2024 Housing Court Case petition, both of which demanded an amount in excess of $80,000.

144.    As of September 4, 2025, Defendants state that Ms. Sattar owes $59.915.86. LAS contests this amount as not including all the credits owed to Ms. Sattar, but it shows that Defendants knew that the amount demanded in the October 30, 2024 Supreme Court Case complaint and the December 6, 2024 Housing Court Case petition are markedly wrong.

145.    As of September 1, 2025, when taking into account (i) the $21,900 that Zara Defendants received from ERAP in or around March 2022; (ii) the rent overcharge credit of $15,872.69 from the April 2024 DHCR Decision; (3) the fact that the DHCR Decision also reduced Ms. Sattar's rent to $1,136.59; and (4) the $6,897.60 left from the 2017 pre-move in deposit, Ms. Sattar only owes $32,617.83.[16]

---

[16] In the Sept. 4, 2025 Stipulation, LAS states that Ms. Sattar owes $39,575. However, this was a mutual mistake that did not take into account the $6,897.60 from Ms. Sattar's 2017 pre-move in deposit. LAS has informed

146.    As of the date of the filing of this complaint, the 2024 Housing Court Case is still an active case with the next court date set for October 30, 2025.

***Defendants are deceptively seeking multiple judgments for the same rental arrears, plus the huge inflations of ERAP, overcharges, and uncredited deposit***.

147.    With the 2020 and the 2023 Housing Court Cases pending, the remedies that Defendants sought in the October 30, 2024 Supreme Court Case – namely rent/use and occupancy from February 2020 onward – were being sought in those prior housing court cases. The Supreme Court Case was unnecessary.

148.    If Attorney Defendants had done a meaningful attorney review of the October 30, 2024 Supreme Court Case, comparing it to the relief sought in the 2020 and 2023 Housing Court Cases – cases where it was also representing Zara Defendants – it would have seen that the that the October 30, 2024 Supreme Court Case was seeking the same judgment on rental arrears.

149.    The same is true for Zara Defendants who verified the October 30, 2024 Supreme Court Case complaint and verified the 2020 and 2023 Housing Court Cases' petitions. If they had in fact reviewed the facts of the complaint, he would have seen that the same relief was being sought

150.    Ms. Sattar suffered both economic and emotional damages as a result of Defendants filing a duplicative and unnecessary Supreme Court Action. *See* ¶¶ 159-177, *infra*.

151.    As if that was not enough, Defendants then filed the December 6, 2024 Housing Court Case a little over a month after the October 30, 2024 Supreme Court Case, seeking exactly the same monetary relief.  In other words, between the October 30, 2024 Supreme Court Case and the December 6, 2024 Housing Court Case, Defendants were seeking a double judgment.

152.    Again, if Attorney Defendants had done a meaningful attorney review of the December 6,

---

Defendants that what was owed in September 2025 was $32,617.83. What is owed at the time of the filing of this complaint is $33,754.42 (an additional month's rent of $1,136.59 for October 2025).

2024 Housing Court Case, or any review at all, it would have seen that the case was seeking the same monetary relief as that demanded in the October 30, 2024 Supreme Court Case.

153.    Similarly, the same is true for Zara Defendants, who verified the December 6, 2024 Housing Court Case petition. If they had done any review at all, they would have seen that the case demanded the same monetary judgment as that sough only a month or so prior.

154.    Although the December 6, 2024 Housing Court Case was a holdover proceeding which sought both a money judgment and eviction, Defendants could have sought eviction – in the form of a common law ejectment claim – in the October 30, 2024 Supreme Court Case.

155.    New York State Supreme Courts are courts of general jurisdiction and as result, can hear all claims and provide all remedies. *See Nestor v. McDowell*, 81 N.Y.2d 410, 415, 615 N.E.2d 991 (1993) ("Thus, when the Legislature creates new remedies and classes of actions or procedures that are tracked to a particular court, it does not divest Supreme Court of its historic general power.")

156.    The December 6, 2024 Housing Court Case was completely duplicative and Ms. Sattar suffered economic and emotional damage in her response to the unnecessary 2024 Housing Court Case. *See* ¶¶159-177, *infra*.

157.    Alternatively, because the December 6, 2024 Housing Court Case sought eviction and the same monetary judgment as that demanded in the Supreme Court Case, Defendants could have just filed the December 6, 2024 Housing Court Case instead of filing the October 30, 2024 Supreme Court Case. But by not doing so, Defendants caused Ms. Sattar to suffer economic and emotional damage needlessly in her response to the unnecessary Supreme Court Case.

158.    Under New York law, it is for the landlord to determine in which court to plead its case. *See Chelsea 18 Partners, LP v. Sheck Yee Mak*, 90 A.D.3d 38, 41, 933 N.Y.S.2d 204 (2011).

However, nowhere in New York law do landlords have carte blanche to sue tenants multiple times for the same remedies, effectively seeking a double judgment.

***Defendants' deceptive scheme to attempt to collect the same rent twice forced Ms. Sattar to respond to duplicative court hearings and caused her emotional distress.***

159.    Ms. Sattar has suffered emotional distress, embarrassment, and humiliation as a result of the Defendants' unlawful attempts to obtain duplicative judgments on the same rental arrears and arrears that were in excess of what was owed, particularly for having to answer the complaints and defend herself when she learned of two other cases against her.

160.    Plastering her apartment door on multiple occasions with something as private as a rent ledger showing her missed rent payments caused Ms. Sattar great fear and humiliation.  *See* ¶¶ 108-113, *supra*. Ms. Sattar lives by herself. Her family is abroad. She also has been repeatedly victimized by Defendants.  During the week that Defendants were plastering her door with the rent ledger and the summons and complaint, to the extent that Ms. Sattar was home and heard the knock at her door, she was too scared to answer. Now, when she hears a knock on her door, she panics, and her anxiety levels increase.

161.    Exposing her private matters to her neighbors by taping the rent ledger on four different days humiliated Ms. Sattar. In her entire life, Ms. Sattar had never felt as embarrassed or as insulted as she did over the course of that week. Some of her neighbors started asking her questions about the lawsuit.

162.     With the October 30, 2024 Supreme Court Case, Ms. Sattar was afraid that she would lose her apartment and be homeless. When asked how it made her feel to receive these Supreme Court papers, Ms. Sattar is unable to verbally answer. Her only answer is to start crying.

163.    In fact, the weekend of November 1, 2024, Ms. Sattar was too scared to leave her apartment and instead stayed home and just cried.

164.    Ms. Sattar suffers from hypertension and high blood pressure. Being sued in the Supreme Court Case about the same issues she was dealing with in housing court only made her feel worse.

165.    Ms. Sattar has found it difficult to sleep, which has only become more of a problem with the October 30, 2024 Supreme Court Case, the December 6, 2024 Housing Court Case and the feeling that this will never end.

166.    Additionally, Ms. Sattar felt guilty that Sarowar Hossaine, the community member who served as her guarantor so she could have a place to live, was also sued. She is unable to show her face to him or any of his family members.

167.    When the Supreme Court clerk informed Ms. Sattar that someone else had to serve her answer in the October 30, 2024 Supreme Court Case by personal delivery to Attorney Defendants, she panicked. Without family, the only person she thought of was her friend. When she learned that her friend was willing to help her even though she was recuperating from a broken leg, Ms. Sattar felt so guilty. But she also felt that she had no choice.

168.    When Ms. Sattar received the papers for the December 6, 2024 Housing Court Case in late January 2025, she again panicked, aggravating her hypertension and blood pressure.

169.    When asked about how it felt to receive the December 6, 2024 Housing Court papers, Ms. Sattar begins to cry. When composed enough to answer she likens it to living in a jungle, surrounded by bad people.

170.    After receiving the December 6, 2024 Housing Court papers, Ms. Sattar cried to Allah, asking if all of this harassment is because she is being punished.

171.    With her high blood pressure and hypertension, Ms. Sattar believes that her body will soon not be able to handle more stress.

172.    After receiving the December 6, 2024 Housing Court papers, Ms. Sattar has realized that unlike other people, where home is a refugee and one can rest from the struggles of the world, for her, coming home the struggles are worse. Her home does not offer that peace.

173.    When she went to Supreme Court to file her answer, there was no Bangladeshi interpreter in the clerk's office. Ms. Sattar, with her limited English, felt inadequate, relying on translation apps on her phone to understand what she was supposed to do.

174.    When asked how she felt receiving more papers seeking to evict her and demanding the same rent arrears sought in at least three prior cases, Ms. Sattar cries.

175.    Ms. Sattar left Bangladesh because of the struggles she faced there. But now, here in the United States, she finds herself in a similar situation with these multiple, simultaneous lawsuits that Defendants are permitted to bring against her with impunity. She fears that Defendants will never stop using the court system to harass her.

176.    Ms. Sattar is a proud woman who does not like to show her emotions publicly. Even at her own mother's funeral, she did not cry. But since October 2024, with the October 30, 2024 Supreme Court Case followed quickly by the December 6, 2024 Housing Court Case, any time Ms. Sattar thinks of these cases or has to talk about them to others, she bursts into tears.

177.    Ms. Sattar fears losing her home of eight years. First, it is hard to find another apartment to rent and second, she does feel a sense of community and safety with some of her neighbors who speak Bengali.

178.    In addition to the emotional toll that the October 30, 2024 Supreme Court Case and the December 6, 2024 Housing Court Case has taken on her, Ms. Sattar has had to miss multiple days of work.

179.    Ms. Sattar is a home health aide who works for a home health aide service. Usually at the

beginning of the week, she is given an assignment for that week. There are two shifts a day: 8 AM to 8 PM and 8 PM to 8 AM.

180.    If Ms. Sattar has to miss work, she does not just miss one day. Instead, the home health aide service will cancel her schedule for the week and assign someone else so that the patient can have continuity during the week.

181.    As a result, if Ms. Sattar misses one day of work a week, she usually loses work for the week.

182.    Ms. Sattar makes $19.10 an hour and makes $988 for a full week of work.

183.    In filing out her answer to the October 30, 2024 Supreme Court Case, Ms. Sattar missed four days of work during one week in early November.  As a result, she lost a full week of wages.

184.    In addition, for each of those four days, she paid for public transportation twice each day and one day she paid twice for her friend.

185.    In filing the motion to dismiss the October 30, 2024 Supreme Court Case complaint, Ms. Sattar had to review and sign her affirmation at LAS' offices. She took April 23, 2025 off from work to meet with LAS and thus was not able to work for the remainder of that week.

186.    With the December 6, 2024 Housing Court Case, Ms. Sattar filed her answer at Queens Housing Court on Monday, February 10, 2025, losing wages for not just that day but the whole week.

187.    Ms. Sattar also paid for public transportation to and from Queens Housing Court to file her answer in the December 6, 2024 Housing Court Case.

188.    Finally, in light of the multiple lawsuits Defendants have brought against her, Ms. Sattar has had to purchase multiple file storage boxes to keep all of these papers.

***Defendants have a pattern and practice of simultaneously suing tenants in multiples suits for the same rent arrears/use and occupancy.***

189.    While it might seem egregious that Defendants have sued Ms. Sattar four times for the same issue, with the last two cases suing for the same amount on the same claims (October 30, 2024 Supreme Court Case and the December 6, 2024 Housing Court Case), this is not a one-off incident for Defendants. Instead, Defendants have a pattern and practice of suing tenants for the same demand in different cases almost simultaneously. As a result, Defendants' behavior is consumer-oriented.

<u>88-15 179 LLC v. Ali, Queens Supreme Court</u>

190.    Yaseen Ali is a tenant in the Zara Defendants' building located at 88-15 179th Street, Apt. 5C, Jamaica, NY 11432.

191.    On or around July 29, 2022, Zara Defendants sued Ms. Ali in Queens Housing Court, *88-15 179 LLC v. Dayaram et al.*, L&T-311345-22-QU (Ali 2022 Housing Court Case). The case was a nonpayment that sought use and occupancy in the amount of $20,093 from June 1, 2020 onward. *See* Petition, Wherefore ¶, in Ali 2022 Housing Court Case.

192.    Although brought by Curtis Harger, Attorney Defendants substituted in as Zara Defendant's counsel on August 16, 2023. *See* Substitution of Attorney, in Ali 2022 Housing Court Case.

193.    On August 16, 2023, Defendants filed a motion where they sought $44,078 in use and occupancy for the period covering June 2020 to August 2023 and then *pendente lite*. *See* Notice of Mot., in Ali 2022 Housing Court Case.

194.    Less than a week later, on August 22, 2023, Defendants filed a second housing court case against Ms. Ali, this time a holdover action, but in the petition, Defendants demand the same use and occupancy demanded in the Ali 2022 Housing Court Case motion, $44,078 covering June

2020 through August 2023. *See* Petition, ¶ 12, in *88-05 179 LLC v. Dayaram et al.*, L&T-314704-23-QU ("Ali 2023 Housing Court Case").

195.    Attorney Defendants filed the petition.

196.    In both housing court cases, Ms. Ali has been fortunate enough to be represented by New York Legal Assistance Group ("NYLAG") through the Right to Counsel program.

197.    On April 15, 2024, in the Ali 2022 Housing Court Case, the Housing Court denied Defendants' motion and instead noted that the case would be set for trial at the next court date. *See* April 15, 2024 Decision/Order, in Ali 2022 Housing Court Case.

198.    On May 8, 2024, the Housing Court set the Ali 2022 Housing Court Case down for trial. *See* Transfer Order, in Ali 2022 Housing Court Case. In that Transfer Order, the Housing Court notes that Defendants stated that as of May 8, 2024, use and occupancy is now approximately $66,000.

199.    About two months later, on July 11, 2024, Zara Defendants, through their counsel Green & Cohen, sued Ms. Ali in Queens Supreme Court for $64,373 in use and occupancy owed starting in 2020. *See* Compl., ¶¶ 9, 12, in *88-15 179 LLC v. Ali et al.*, Queens Supreme Court 714316/2024 ("Ali Supreme Court Case").

200.    Even though Ms. Ali submitted a *pro se* answer in the Ali Supreme Court Case, on December 13, 2024, Defendants moved for a default judgment after inquest against all defendants, including Ms. Ali. *See* Notice of Motion, in Ali Supreme Court Case.

201.    There is no Right to Counsel program in Supreme Court and as a result, Ms. Ali is not represented by counsel.  As a result she did not oppose Defendants' motion.

202.    On or around February 18, 2025, the Court denied Defendants' motion for a default judgment after inquest in the Ali Supreme Court Case on the grounds that Defendants failed to

provide facts that show it has a cause of action. *See* Feb. 18, 2025 Order, in Ali Supreme Court Case.

203.    As of the date of the filing of this complaint, all three of Defendants' cases against Ms. Ali – Ali 2022 Housing Court Case, Ali 2023 Housing Court Case, and Ali Supreme Court Case – are active cases.

<u>57 Elmhurst, LLC v. Ruiz et al., Queens Supreme Court</u>

204.    Magnolia Ruiz is an 84-year-old senior who lives in another of the Zara Defendants' buildings, 94-25 57th Ave., Apt. 7G, Elmhurst, New York 11373.

205.    Zara Defendants sued Ms. Ruiz in Queens Housing Court in 2019 in a holdover proceeding.  *See 57 Elmhurst, LLC v. Ruiz et al.*, L&T 071941-19-QU (Ruiz Housing Court Case).  However, on December 20, 2022, Zara Defendants moved the court for $63,995.57 in use and occupancy and *pendente lite*. *See* Petitioners' Notice of Motion, in Ruiz Housing Court Case.

206.    Because of Housing Court's Right to Counsel program, Ms. Ruiz was able to retain JASA Legal Services for Elder Justice ("JASA") to represent her. JASA opposed the motion and on January 19, 2023, Queens Housing Court denied Zara Defendants' demand for use and occupancy and in terms of payments going forward, only allowed Zara Defendants to charge $500 per month in light of the fact that Ms. Ruiz received Section 8 and was low-income. *See* Jan. 19, 2023 Decision, in Ruiz Housing Court Case.

207.    In or around February 2023, Ms. Ruiz's was awarded ERAP in the amount of $21,806.04 which was paid directly to Zara Defendants.

208.    On March 29, 2023, Zara Defendants and Ms. Ruiz settled the matter with a two-year renewal lease to start March 1, 2023 at a monthly rent of $1,816.09. Through counsel, Curtis

Harger for Zara Defendants and JASA for Ms. Ruiz, they filed the Stipulation of Settlement which was So Ordered by Queens Housing Court. *See* Mar. 29, 2023 Stipulation, in Ruiz Housing Court Case.

209.    Although the Ruiz Housing Court Case was settled, on April 12, 2023, Zara Defendants, by their attorney Green & Cohen, sued Ms. Ruiz in Queens Civil Court seeking $50,000 in alleged rental arrears starting from October 1, 2019 to the present. *See 57 Elmhurst, LLC v. Ruiz*, CV-006145-23-QU ("Ruiz Civil Court Case"). *See* Attorney Aff., ¶ 19, in *57 Elmhurst, LLC v. Ruiz*, Queens Supreme Court 701621/2025 ("Ruiz Supreme Court Case")[17].

210.    Ms. Ruiz retained JASA to represent her in the civil court case and on or around May 16, 2023, JASA filed a motion to dismiss due to the fact that the matter was fully settled in the Ruiz Housing Court Case. *See* Attorney Aff., ¶¶ 19-20, in Ruiz Supreme Court Case.

211.    On or around April 10, 2024, Queens Civil Court dismissed the case based upon *res judicata*, finding that "A decision on the merits was rendered regarding past use and occupancy, and was not appealed by plaintiff. The issue of past use and occupancy for the period of October 2019 through March 2023 was raised, argued, decided, and settled between the parties. Res judicata prevents either party from attempting to re-litigate claims already settled and decided with finality." *See* Attorney Aff., Exhibit D, in Ruiz Supreme Court Case.

212.    Even though Defendants  received a clear message from Queens Civil Court that the matter had been decided in the Ruiz Housing Court Case, on January 13, 2025, Zara Defendants, through its counsel Green & Cohen, filed an action in Queens Supreme Court seeking $50,000 in use and occupancy from October 2019 through March 28, 2023, the same amount sought and time period covered in Ruiz Civil Court Case. *See* Compl., ¶¶ 5, 16-18, in Ruiz Supreme Court

---

[17] Unfortunately, New York's civil court files are not available online. Facts pertaining to Ms. Ruiz's civil court case can be found in Ms. Ruiz's attorney's affirmation in the subsequently filed Queens Supreme Court case.

Case.

213.    If Attorney Defendants did the due diligence required of attorneys before filing cases, it would have seen that Ruiz Supreme Court Case was frivolous as the matter had already been decided.

214.    Again, JASA had to use its resources to move to dismiss the case because the claim had been settled in Ruiz Housing Court Case and was dismissed in Ruiz Civil Court Case.

215.    On or around September 5, 2025, Queens Supreme Court dismissed the complaint as against Ms. Ruiz finding that the issue of rent arrears from October 2019 to March 2023 had been decided twice and *res judicata* prevented it from being relitigated a third time. *See* Sept. 5, 2025 Order, in Ruiz Supreme Court Case.

### 57 Elmhurst, LLC v. Tamay et al., Queens Supreme Court

216.    Jesus Perez Tamay and Elsa Maria Tamay ("the Tamays") are tenants in the Zara Defendants' building located at 94-25 57th Ave., Apt. 2U, Elmhurst, New York 11373.

217.    On or around July 28 2020, Zara Defendants sued the Tamays in Queens Housing Court for rent arrears in the amount of $12,586 from April 2020 to July 2020. Zara Defendants maintained that monthly rent was $3,146.50. *See* July 13, 2022 Decision/Order, in *57 Elmhurst, LLC v. Tamay et al.*, L&T-055529-20-QU ("Tamay 2020 Housing Court Case").[18]

218.    Through the Right to Counsel program, the Tamays retained LAS to represent them.

219.    LAS and Attorney Defendants engaged in motion practice in the Tamay 2020 Housing Court Case, with Queens Housing Court eventually dismissing Defendants' petition but allowing the Tamays' counterclaims to go to trial.

220.    Even though the Tamays' 2020 Housing Court Case was actively being litigated, on

---

[18] Tamay 2020 Housing Court Case was filed before Queens Housing Court was on e-file. As a result, the Petition is not available online. Information about the Petition is from the first court decision found online.

December 28, 2022, Zara Defendants, through their counsel Curtis Harger, sued the Tamays again in Queens Housing Court to evict them. *57 Elmhurst, LLC v. Tamay et al.*, L&T-320054-22-QU ("Tamay 2022 Housing Court Case").

221.    Through the Right to Counsel program, the Tamays retained LAS to represent them and on or around November 20, 2023, Queens Housing Court joined the Tamay 2022 Housing Court Case with the Tamay 2020 Housing Court Case so the two cases could be heard together. *See* Nov. 20, 2023 Court Notice, in Tamay 2022 Housing Court Case.

222.    While the trial on the counterclaims was ongoing in the Tamay 2020 Housing Court Case and Defendants were actively pursuing claims in the Tamay 2022 Housing Court Case, Zara Defendants, through their counsel Green & Cohen, sued the Tamays in Queens Supreme Court on June 28, 2024. *See 57 Elmhurst LLC v. Tamay et al.*, Queens Supreme Court 713551/2024 (Tamay Supreme Court Case).

223.    In the Tamay Supreme Court Case, Defendants demanded $113,274 in rent/use and occupancy at a monthly rate of $3,146.50 even though what the monthly rent was currently being adjudicated in Tamay 2020 Housing Court Case. *See* Compl., ¶ 9, 12, in Tamay Supreme Court Case.

224.    The Tamays were lucky enough to retain LAS to represent them in the Queen Supreme Court Case.

225.    On July 31, 2024, while the Tamay 2020 Housing Court Case trial was happening, Defendants moved Queens Supreme Court through an Order to Show Cause to stay the two Tamay Housing Court Cases – cases they chose to bring in Housing Court but evidently were not satisfied with where the cases were going – and consolidated all the cases before Queens Supreme Court. *See* Attorney Affirmation in Support of OSC, in Tamay Supreme Court Case.

226.    LAS opposed Defendants' Order to Show Cause and on November 27, 2024, Queens Supreme Court dismissed the Defendants' request to consolidate all actions on a technicality. *See* Dec. 2, 2024 Order, in Tamay Supreme Court Case.

227.    On December 11, 2024, Defendants moved Queens Supreme Court again to stay the housing court cases and consolidate them before Queens Supreme Court. *See* Notice of Motion, in Tamay Supreme Court Case. LAS again opposed the motion and on July 23, 2025, Queen Supreme Court denied the Defendants' motion to consolidate the cases noting that Housing Court is the preferred forum for these disputes. *See* July 24, 2025 Order, in Tamay Supreme Court Case.

228.    These are just three other examples. Upon information and belief, Defendants have also sued tenants for the same rent arrears/use and occupancy in Queens Civil Court while housing court cases seeking the same are pending. Unfortunately, Queens Civil Court case files are not available online and as a result are not easily searchable.

### *Defendants have a pattern and practice of suing for amounts not owed.*

229.    Both Zara Defendants and Attorney Defendants have a pattern and practice of suing tenants for rent arears and/or use and occupancy that is not owed and exceeds what is owed.

230.    The NYAG 2025 Action is precisely about Zara Defendants charging inflated rents. In its petition, it provides examples of 27 tenants across various Zara buildings in Queens who became victims of these overcharges. *See* Petition, ¶¶ 86-260, in NYAG 2025 Action

231.    Additionally, for nine of these 27 examples, Zara Defendants sued the tenants for the inflated amounts. In each of these cases, Green & Cohen either filed the case or took over representation from Curtis Harger.

    a.    *See Parsons 88 Realty LLC v. Jean David Fabulus, et al.*, LT-315626-23-QU

(Green & Cohen filed the petition); *see also* Petition, ¶¶ 86-92, in NYAG 2025 Action;

b. See *King's Park 148 LLC v. Raymond Pierluisse, et al.*, LT-319738-23-QU (Green & Cohen filed the petition); *see also* Petition, ¶¶ 93-100, in NYAG 2025 Action;

c. See *Jamaica Seven LLC v. Channel Depreece Daniels et al.*, LT-305475-23-QU (Green &Cohen substituted in as attorney on August 31, 2023); *see also* Petition, ¶¶ 101-105, in NYAG 2025 Action;

d. See *Jamaica Seven LLC v. Shanaya Marie Lynch et al.*, LT-309352-23-QU (Green & Cohen substituted in as attorney on June 22, 2023); *see also* Petition, ¶¶ 111-115, in NYAG 2025 Action;

e. See *Zara Realty Holding Corp. v. Janice Alicia Martin et al.*, LT-319783-23-QU (Green & Cohen filed the petition); *see also* Petition ¶¶ 116-119, in NYAG 2025 Petition;

f. See *195-24 LLC v. Isiah Lataria Pinkney et al.*, LT-301027-24-QU (Green & Cohen substituted in as attorney on April 24, 2024); *see also* Petition ¶¶ 120-122, in NYAG 2025 Petition;

g. See *195-24 LLC v. Isiah Lataria Pinkney et al.*, LT-309240-25-QU (Green & Cohen filed the petition); *see also* Petition ¶¶ 123-124, in NYAG 2025 Petition;

h. See *Belair Park 8825 LLC v. Ryan Kumal et al.*, LT-311554-24-QU (Green & Cohen filed the petition); *see also* Petition ¶¶ 133-136, in NYAG 2025 Action; and

i. See *Ash Ave LLC v. Jian Yu Ren et al.*, LT-302095-23-QU (Green & Cohen

substituted in as attorney on July 5, 2023); *see also* Petition ¶¶ 176-179, in NYAG

2025 Action.

232.  Queens Housing Court has also noted Defendants' propensity to seek rent not owed,

highlighting three other recent housing court cases when imposing sanctions. See *57 Elmhurst*

*LLC v. Morales*, 82 Misc.3d 1243(A), 209 N.Y.S.3d 827 (Queens Civil Court, L&T Ind. No. 31-

271-23-QU May 7, 2024).

233.  This is what precisely happened to Ms. Sattar. In the October 30, 2024 Supreme Court

Case, Defendants demand a wildly exorbitant amount - $80,557.74 – conveniently failing to take

into account (i) the $21,900 that Zara Defendants received from ERAP in or around March 2022;

(ii) the rent overcharge credit of $15,872.69 from the April 2024 DHCR Decision; (3) the fact

that the DHCR Decision also reduced Ms. Sattar's rent to $1,136.59; and (4) the $6,897.60 left

from the 2017 pre-move in deposit.

234.  Then in the December 6, 2024 Housing Court Case, Defendants seek essentially the same

judgment - $83,355.74 – less than two months later.  Again, Defendants conveniently fail to take

into account the ERAP, the DHCR overcharge credit, the DHCR rent reduction order, and the

pre-move in deposit.

235.  As a result, both Zara Defendants and Attorney Defendants' pattern and practice of

demanding rent in excess of what is owed is consumer-oriented conduct and impacts a large

number of tenants.


**FIRST CLAIM**


**Violations of Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.**
**(Against Attorney Defendants)**


236.  Plaintiff repeats and realleges each and every allegation set forth above as if reasserted

and realleged herein.

237.    The purpose of the Fair Debt Collections Practices Act ("FDCPA") is "to eliminate abusive debt collection practices by debt collectors, to insure that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e); *see also Hamilton v. United Healthcare of La., Inc.* 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

238.    Congress designed the FDCPA to be enforced primarily through private parties, such as Plaintiff, acting as "private attorneys general." *See* S. Rep. No. 382, 95th Con,. 1st Sess. 5, ("The committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance . . . ."); and *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d Cir. 2008) ("In this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated Counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

239.    The obligation alleged to be owed by Plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the rental arrears were incurred for a residential apartment.

240.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt" as defined by 15 U.S.C. § 1692a(5).

241.    For the reasons set forth in the "Parties" section of this Complaint, Attorney Defendants are "debt collectors" as defined in 15 U.S.C. § 1692a(6).

242.    Attorney Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f. By way of example and not limitation, Attorney Defendants violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; falsely representing or implying that a communication is from an attorney; threatening to take and actually taking an action prohibited by law; using any false, deceptive or misleading representations or means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

243.    As a direct and proximate result of Attorney Defendants' violations, Plaintiff has suffered damages, including, *inter alia*, significant emotional distress, embarrassment, humiliation, increase of blood pressure, forgone wages because of missing work, and associated transportation costs.

244.    The injuries inflicted on Plaintiff by the Attorney Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

245.    Plaintiff suffered economic injuries that historically have provided a basis for lawsuits in American courts, including but not limited to foregone wages and costs of transportation.

246.    Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: wrongful litigation, negligence, invasion of privacy, intrusion upon seclusion, and abuse of process.

247.   The Attorney Defendants had a duty to exercise reasonable care in the collection of debts, including in ensuring that it was not seeking double judgment or a demanding an amount not owed.

## SECOND CLAIM

### Violation of New York General Business Law § 349
### (Against All Defendants)

248.   Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

249.   New York General Business Law § 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state." An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. L. § 349(h).

250.   As enumerated above, Defendants violated New York General Business Law § 349 by using deceptive acts and practices in the conduct of their businesses. These acts were done by Defendants systematically and, as such, have had a broad impact on consumers at large.

251.   Defendants committed the above-described acts willfully and/or knowingly.

252.   The Defendants' deceptive conduct towards Plaintiff is the type of conduct that has a broad impact on consumers at large.

253.   Defendants' violations were willful and knowing, or, at minimum, evidence a conscious and reckless disregard for basic fairness and for the law. Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

254.   As a direct and proximate result of Defendants' violations, Plaintiff has suffered

damages, including, *inter alia*, significant emotional distress, embarrassment, and humiliation.

255. The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

256. Plaintiff suffered economic injuries that historically have provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for forgone wages because of missing work, and associated transportation costs.

257. Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: wrongful litigation, negligence, invasion of privacy, intrusion upon seclusion, and abuse of process.

258. Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts, including the accurate amount demanded and not to seek double judgment.

259. Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff and unless enjoined will cause further irreparable injury.

260. As a direct and proximate result of those violations of N.Y. Gen. Bus. § 349, Plaintiff has suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and damages, together with costs and attorney's fees.

## THIRD CLAIM

### Violation of New York Judiciary Law § 487
### (Against Attorney Defendants)

261.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

262.    New York Judiciary Law § 487 creates a private right of action against an attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;" or "willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

263.    New York Judiciary Law § 487 is a traditional cause of action in American courts; it is "the modern-day counterpart of a statute dating from the first decades after Magna Carta; its language virtually (and remarkably) unchanged from that of a law adopted by New York's Legislature two years before the United States Constitution was ratified." *Amalfitano v. Rosenberg*, 12 N.Y.3d 8, 14 (2009).

264.    Plaintiff is entitled to actual damages, treble damages, and attorneys' fees and costs for the violations of New York Judiciary Law § 487, and Plaintiff so seeks.

## FOURTH CLAIM

### Gross Negligence
### (Against All Defendants)

265.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

266.    Had Defendants exercised even slight diligence they would have known their conduct was unlawful.

267.    Defendants' failure to exercise even slight care or diligence amounts to gross negligence.

268.   Defendants' actions evince a reckless disregard for the rights of Plaintiff and others. The actions have the appearance of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

269.   Defendants' conduct demonstrates a high degree of moral culpability and willful or wanton negligence or recklessness. As a result, Plaintiff is entitled to a punitive damage award.

270.   Attorney Defendants owed Ms. Sattar a duty pursuant to the FDCPA, which is designed to protect consumers in part by prohibiting debt collectors from using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; using false, deceptive or misleading representations or means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

271.   Creditors and debt collectors in general owe debtors a duty of reasonable care in collecting their debts. *Hawkins-El v. First American Funding, LLC*, 891 F. Supp. 2d 402, 412 (E.D.N.Y. 2012), aff'd 529 F. Appx. 45 (2d Cir. 2013).

272.   New York General Business Law § 349 also imposes on all Defendants a duty to not engage in deceptive acts and unlawful practices in the conduct of their business.

273.   Defendants breached these duties.

274.   As a direct and proximate result of Defendants' breach of these duties, Ms. Sattar suffered compensable harm, including actual damages and emotional distress.

275.   Defendants' conduct was so flagrant as to transcend mere carelessness and constitute willful negligence or recklessness. Defendants have engaged in a pattern and practice of similar behavior against other tenants. As a result, Ms. Sattar is entitled to actual and punitive damages.

## DEMAND FOR JURY TRIAL

276.    In accordance with Fed. R. Civ. P. 38(b), Ms. Sattar demands a trial by jury on all issues

so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

a)  Assume jurisdiction of this action;

b)  Declare that Attorney Defendants violated the Fair Debt Collection Practices Act,

15 U.S.C. §§ 1692 et seq.,

c)  Declare that Attorney Defendants violated New York Judiciary Law § 487;

d)  Declare that Defendants' violated New York General Business Law § 349;

e)  Enjoin Defendants from committing similar deceptive practices in the future;

f)  Award Plaintiff actual damages from Defendants;

g)  Award Plaintiff punitive damages for gross negligence from Defendants;

h)  Award Plaintiff the greater of statutory damages or treble damages capped at

$1,000 pursuant to New York General Business Law § 349(h);

i)  Award Plaintiff treble damages from Attorney Defendants pursuant to New York

Judiciary Law § 487;

j)  Award Plaintiff statutory damages against Attorney Defendants pursuant to the

Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(a)(2)(A);

k)  Award Plaintiff reasonable attorney's fees and costs against Defendants pursuant

to New York General Business Law § 349(h) and against Attorney Defendants

pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(a)(3)

Dated:  October 28, 2025
          Queens, New York

Respectfully Submitted,

THE LAW OFFICE OF AHMAD KESHAVARZ

*/s/Ahmad Keshavarz*
Ahmad Keshavarz
Kevin Gartland
16 Court St., 26th Floor
Brooklyn, NY 11241
Tel: (718) 522-7900
Fax: (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com


THE LEGAL AID SOCIETY

*/s/ Elizabeth M. Lynch*
Elizabeth M. Lynch
Edward Jospehson
Ellen McCormick
153-01 Jamaica Ave, 2nd Floor
Jamaica, NY 11432
Tel: (718) 286-2450
Email: emlynch@legal-aid.org